# Richmond

VIRGINIA BOWMAN WITTE, ET AL. *v.* FRED HARPER,
ADMINISTRATOR, ETC.

January 14, 1937.

Present, Campbell, C. J., and Hudgins, Gregory, Browning, Eggleston
and Spratley, JJ.

The opinion states the case.

*Caskie & Frost,* for the appellants.

*Williams & Robertson* and *Fred Harper,* for the appellees.

EGGLESTON, J., delivered the opinion of the court.

We are here called upon to interpret certain provisions in the will of Willie A. Bowman, deceased, in the light of the following agreed facts:

Miss Bowman, Miss V. Estelle Frazier, and Miss Annie H. Ford were for years intimate friends and co-workers at the Lynchburg Female Orphan Asylum. In 1931, they formulated plans for building a joint home in the city of Lynchburg, at the estimated cost of $6,000, which was to be equally divided between them, and in which property each was to have an undivided one-third interest.

To this enterprise Miss Bowman contributed a lot, then owned by her, at the agreed value of $1,000, Miss Frazier contributed $1,000 in cash, and they arranged to borrow on the property the sum of $4,000 from the Lynchburg Female Orphan Asylum. As the legal title to the lot stood in the name of Miss Bowman, she executed the necessary papers evidencing and securing the loan, which, however, they agreed between themselves to discharge in the following proportions: Miss Bowman was to pay $1,000, Miss Frazier $1,000, and Miss Ford, who had theretofore contributed nothing to the venture, was to pay $2,000. In this manner each would have contributed $2,000 to the total enterprise and would have the desired one-third individual interest in the property. No part

of the agreement between the three ladies was reduced to writing. As it developed Miss Ford actually contributed nothing to and afterwards withdrew from the undertaking.

In December, 1931, the three ladies took up their residence in their new home, which they named "Windsong" and was located at 505 Brevard Street, in the said city.

On February 16, 1932, Miss Bowman wrote her holographic will, in which, after disposing of other real and personal property, she inserted the following provisions which are material to this controversy:

"The property known as 505 Brevard Street belongs equally to Annie H. Ford, V. Estelle Frazier and me, Willie A. Bowman. My share in this property I give to Annie H. Ford and V. Estelle Frazier on condition that they carry the mortgage and keep the property up. If they do not wish to remain at Windsong as their residence they may sell it, by mutual consent. If one wishes to live there and the other does not, I leave my entire interest to the one who makes it her home, the terms of division being made by the two parties concerned, Annie H. Ford and V. Estelle Frazier."

On November 1, 1932, Miss Bowman executed a deed of trust on other real estate owned by her and known as number 504 Westwood Avenue, in the city of Lynchburg, to secure a bond in the principal sum of $2,000. On November 28th, of the same year, she borrowed the sum of $500 from the Lynchburg Trust & Savings Bank on this $2,000 bond as collateral security. In the following January this loan was increased to $1,000. Just what Miss Bowman did with the proceeds of these two loans does not appear in the record or seem to be material to the present inquiry.

On November 19, 1932, Miss Bowman wrote a codicil to her will in the form of the following letter directed to Miss Ford and Miss Frazier:

"Dear Annie & Estelle,

"This is a statement of the present financial condition of Windsong and of my desire in regard to its disposition, should

anything happen to me to make it necessary for final action to be taken.

"The present indebtedness is the bond for $4,000.00 due the Lynchburg Female Orphan Asylum. One-fourth of this I owe, according to our agreement. To meet this I should like for you to use $1,000.00 from the bond recently made at the Lynchburg Trust & Savings Bank on 504 Westwood Avenue. If it is possible to save this property from sale, I hope it may be done.

"The furniture bought for Windsong I want left in the house and any other articles that have no family significance. I do not want anything sold, but wish the family to have any articles of family association that they wish to hold in the family possession.

"If you wish to assume the financial obligation, remaining after the settlement of my part, I want you to share the place equally. Of this amount of obligation Estelle is responsible for $1.000.00 and Annie for $2,000.00 as you understood. While I should like for you to continue to live at Windsong, I leave this decision to you. If either of you should want to hold the place exclusively, you can adjust it as you wish. If Annie does not wish to continue the obligation for the $2,-000.00 I think Estelle will have no trouble arranging the matter, in which case Estelle will pass into sole ownership. You will understand why I mention this.

"Should this latter arrangement be made there will be enough money left from the Bond on 504 Westwood to pay bankruptcy costs for A. C. Witte and he and Mrs. Witte might come and live with Estelle, paying a proportional share of the living expense from the rent of the two houses.

"My will holds good in disposition of all properties not mentioned in this letter."

Miss Bowman died on February 27, 1933, and shortly thereafter her will was probated. Miss Ford promptly renounced all interest in the property, and therefore has no concern with the present litigation.

It was ascertained that Miss Bowman's estate was heavily

indebted to one or more local banks for sums borrowed by her on hypothecated securities. Due to the then (March, 1933) existing economic conditions, the value of these pledged securities was generally considered to be less than the amount of the loans. Interest on the mortgage indebtedness on the Windsong property was in arrears and taxes thereon were unpaid. It then appeared quite likely that the personal property would be insufficient to pay the debts of the estate. Creditors indicated that they might have to force a sale of decedent's real estate, including Windsong, unless Miss Frazier and the other devisees of the real estate would guarantee the payment of the decedent's debts. This Miss Frazier was unwilling to do.

Consequently, in January, 1934, the Lynchburg Female Orphan Asylum, the holder of the mortgage on the Windsong property, directed a foreclosure of the same. At the sale the property was bought by Miss Frazier, over other bidders, at the sum of $4,855. This amount was sufficient to pay the expenses of sale, the taxes, the full amount of the principal and accrued interest of the debt secured, and leave in the hands of the trustee a surplus of $195.78. The disposition of this surplus is one of the questions here involved.

In order to finance her purchase of the property Miss Frazier obtained a loan of $4,000 from the Orphan Asylum, and secured the same by a first lien deed of trust on the property.

In the meantime, the securities which Miss Bowman had hypothecated with the local banks to secure loans made to her had so improved in value that the banks were able to realize therefrom the full amounts of the debts due them. The other personal property had likewise increased in value to such an extent that it was sufficient to pay all the debts of the decedent without recourse to any of the real estate.

Miss Frazier then called upon the personal representative to pay to her the sum of $1,000, which Miss Bowman had acknowledged in the will was her (Miss Bowman's) share of the mortgage debt, and which the codicil had directed should be paid by hypothecating "the bond recently made at the

Lynchburg Trust & Savings Bank on 504 Westwood Avenue."

The devisees of the Westwood Avenue property objected to this payment on the ground that under the terms of the will and codicil such payment was conditioned upon Miss Frazier's assuming and discharging the mortgage indebtedness on the Windsong property; that such condition had not been complied with, in that Miss Frazier had permitted and allowed the property to be sold under the deed of trust; and that such foreclosure had resulted in the payment of the whole debt secured, leaving nothing due thereon by Miss Bowman's estate.

Miss Frazier also demanded that the trustee pay to her the surplus of $195.78 remaining in his hands from the foreclosure of the Windsong property.

To settle these questions the present suit was brought.

The lower court held and decreed that the estate of Miss Bowman was indebted to Miss Frazier in the sum of $1,000, with interest thereon at the rate of 6% per annum from November 2, 1932, until paid, "being the amount which the said Willie A. Bowman promised and agreed to pay toward the joint construction of the residence referred to in her will and codicil as 'Windsong'," and that said indebtedness under the terms of the will and codicil was a charge upon the number 504 Westwood Avenue property.

It, also, held and decreed that Miss Frazier was entitled to the whole of the surplus of $195.78 held by the trustee.

Under our view of the matter the decree of the lower court was erroneous in both respects—(1) In holding that Miss Frazier was entitled to be paid the sum of $1,000 out of the estate of Miss Bowman; and (2) in holding that Miss Frazier was entitled to the whole fund of $195.78.

It is clear, we think, that the gift of $1,000 was conditioned upon the assumption and discharge of the mortgage debt by Miss Frazier, or by her and Miss Ford. The codicil states the proportions in which the three had agreed that the debt should be paid: Miss Bowman, $1,000, Miss Frazier, $1,000, and Miss Ford, $2,000.

What Miss Bowman, in effect, said to her colleagues was: "If the two of you, or if Miss Frazier, will carry on and pay

this debt, I bind my estate to pay my share thereof." 'But it is clear that she did not intend that this burden of $1,000 should be borne by her estate unless her colleagues, or at least one of them, should discharge the rest of the debt.

But the condition imposed by the testatrix was not complied with. As we have seen, Miss Ford promptly renounced all interest in the property. Nor did Miss Frazier assume and pay off the indebtedness, for she allowed the property to be sold under the deed of trust. Since the property brought more than the amount of the debt, the effect of the foreclosure sale was to discharge and pay off the debt in full, including the share due by Miss Bowman and her colleagues. Miss Bowman's estate, therefore, owed nothing further towards the debt because it had been extinguished.

But counsel for Miss Frazier argue that at the time of the foreclosure it was not practical for her to assume and carry on the mortgage. It then appeared that the value of the personalty was insufficient to take care of all of the debts, and that a part of the real estate would have to be sold. Consequently it did not then appear to Miss Frazier's interest to assume and pay off the mortgage debt, for even then the creditors might have forced a sale of the property to satisfy the decedent's debts, and she stood to lose the property unless she purchased it anew. She frankly states in her answer that this is why she permitted the property to be sold under the deed of trust.

Of course, Miss Frazier was entirely within her rights in so deciding. But what prompted her decision and action was not the protection of Miss Bowman's estate, but the protection of her (Miss Frazier's) own interest. She thought that she could acquire the property at a lower price at a foreclosure sale than she could by paying off the mortgage and then running the risk of having to buy it again at a sale forced by the creditors.

But whatever may have been her reasoning, and however justifiable may have been her action, it is too clear for argument that Miss Frazier did not comply with the condition specified in the will—that she should assume and pay off the

mortgage debt—in order to be entitled to the payment of $1,000 from Miss Bowman's estate.

Nor do we think it is material that Miss Frazier now owns the property subject to a mortgage held by the Orphan Asylum in the precise amount of $4,000 which Miss Bowman had placed thereon. This is a mere coincidence. There is no suggestion that she was under any obligation either to bid a sufficient amount to pay the mortgage or to borrow any amount from the Orphan Asylum. She was entirely free to allow someone else to buy the property, or, even if she were the successful bidder, to negotiate a loan wherever she could.

If her argument be sound, then if she had bid the property in at less than the amount of the mortgage, and had obtained a loan thereon of $4,000 from the Orphan Asylum, she would have been entitled to the $1,000 under the will, although this would have left a deficit on the mortgage debt to be paid by Miss Bowman's estate.

Suppose someone else had bid in the property at the same amount at which it was knocked down to Miss Frazier. Would the latter then have been entitled to the $1,000? Of course not. Suppose Miss Ford, instead of Miss Frazier, had bid in the property and obtained the new loan from the Orphan Asylum. Would she (Miss Ford) have been entitled to the $1,000? Certainly not, because, as we have seen, she repudiated the transaction, refused to take the property under the will, and declined to assume any part of the mortgage indebtedness.

In the final analysis we think that this is precisely what Miss Frazier did. For she, too, declined to assume and discharge the mortgage indebtedness and elected to obtain title to the property through a foreclosure proceeding.

Aside from the will there is, in equity, no more reason why Miss Bowman's estate should pay $1,000 to Miss Frazier than there is that Miss Frazier should pay Miss Bowman's estate the same amount. As the matter turned out, after Miss Ford declined to continue the enterprise, the foreclosure sale wiped out the $1,000 equity which Miss Bowman and Miss Frazier had each put into the venture. But

the foreclosure sale likewise discharged the mortgage debt in full and left neither partner owing anything to the other.

After Miss Ford withdrew from the enterprise, and Miss Frazier was unwilling to accept the property under the conditions stated in the will—that she assume and discharge the mortgage—in equity the property was owned in equal proportions by Miss Bowman's estate and Miss Frazier, subject to the mortgage of $4,000. It follows, therefore, that the surplus of $195.78 remaining in the hands of the trustee from the foreclosure sale should be divided equally between the estate of Miss Bowman and Miss Frazier.

The decree is reversed and the cause remanded for further proceedings not inconsistent with the views herein expressed.

*Reversed and remanded.*